**GUARINO & CO. LAW FIRM, LLC**
26 Park Street, Suite 2057
Montclair, NJ 07042
973/509-1791
guarinolaw@gmail.com
Attorneys for Debtor-in-Possession

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In re: | : | Case No. 17-31858 |
| | : | |
| EVERGREEN PRODUCTS, | : | |
| LLC, | : | Chapter 11 |
| | : | |
| Debtor. | : | |
| | : | |

**DEBTOR'S MOTION FOR ORDER APPROVING PRIVATE SALE OF THE DEBTOR'S PROPERTY OF THE ESTATE FREE AND CLEAR OF LIENS AND ENCUMBRANCES PURSUANT TO 11 U.S.C. §§ 363(b) and (f).**

Now comes the debtor-in-possession, Evergreen Products, LLC (the "**Debtor**"), in the

above Chapter 11 case, and hereby moves, pursuant to Bankruptcy Code §§ 363(b) and (f) and

Bankruptcy Rule 6004(c), for authority to sell the estate's interest in property of the Debtor,

described in particularity below, free and clear of all liens, claims, mortgages, security interests,

charges, encumbrances, and other interests to EGP Enterprises, LLC ("**EGP**") for the total sum of

$50,000.  This Court has jurisdiction over this chapter 11 case under 29 U.S.C. § 1334(b).

The matters set forth herein constitute core proceedings pursuant to 28 U.S.C. § 157(b)(2)(N).  In

support of the Motion, the Debtor respectfully states as follows:

**HISTORY OF CASE AND DISCLOSURE PURSUANT TO LOCAL RULE 6000-1 (c)(1)(F)**

1.  The Debtor filed a petition for relief under Chapter 11 of the United States

Bankruptcy Code in this Court on October 29, 2017 (the "**Petition Date**").

2. In or about the Petition Date, the Debtor began winding down its operations.

3. Shortly after the Petition Date, the Debtor filed applications to employ counsel and an accountant, which applications were granted.

4. A representative of the Debtor appeared and was questioned at a 341 Meeting of Creditors.

5. Prior to the Petition Date, the Debtor engaged Ideal Trading Asset Recovery Solutions ("**Ideal**"), experienced auctioneers, appraisers and liquidators, to appraise and value the assets of the Debtor. Ideal issued an appraisal on October 16, 2017 (the "**Appraisal**).

6. The assets appraised consist of office furniture and electronics, inventory and scrap, as well as certain vehicles and forklifts (the "**Assets**"). The Assets appraised are detailed on the List of Assets Appraised, annexed as **Exhibit A**.

7. In appraising the Assets, the valuation method is set forth in the Appraisal Report, annexed as **Exhibit B**.

8. The forced liquidation value of the Assets was found to be $42,525.

9. The Appraisal was obtained by the Debtor, because the Debtor negotiated for a sale of the Assets to EGP pre-petition. A Sale Contract, subject to Bankruptcy Court approval, was entered into on October 27, 2017. *See* Contract, annexed as **Exhibit C**.

10. By this Motion, the Debtor is requesting an Order authorizing it to sell the Assets free and clear of all claims, liens, mortgages, security interests, charges, encumbrances, and other interests of records under § 363(f) of the Bankruptcy Code.

11. The Debtor believes that the estate will attain the highest value if the Assets are sold together, as the cost to move, warehouse, inventory and market adversely affects the value of the Assets—as Ideal concluded.

12. The Debtor engaged in extensive negotiations with EGP, and attempted to obtain the best possible price for the Assets. EGP was willing to pay more than the appraised value of the Assets, because EGP will engage in the same business as that of the Debtor. Moreover, EGP is to employ the Debtor's principals. Prior to entry of the Agreement, the Debtor attempted to solicit other bids and transactions with other parties, but no higher or better offer was obtained.

## SALE OF THE ASSETS

14. The contract for the sale of Assets is annexed as **Exhibit C**. The material terms are as follows:

a. **Purchase Price**. The purchase price for the Assets is $50,000 (the "**Purchase Price**").

b. **Assets Sold**:     Although more particularly described at Section 2.1 of the Contract, the contract essentially provides for the acquisition of the Debtor's cash and cash equivalents, accounts receivable, intellectual property, equipment, machinery, fixtures, furniture, furnishings, vehicles, computer equipment and telephone equipment, inventory, office supplies, advertising, marketing and promotional materials, transferable permits, licenses, certifications and approvals, agreements and contracts, telephone numbers and internet domains, rights of action, prepaid expenses, credits, advance payments, claims, security, refunds, rights of recovery, rights under warranties, insurance benefits, and books and records, and intangible assets.

The only assets actually possessed by the Debtor, however, are those set forth in the detailed list of assets appraised, set forth in **Exhibit A** hereto.

c. **Liabilities**. No liabilities of the Debtor are to be assumed by the buyer.

d. **Closing Date**. The Closing will occur on a date mutually agreed upon by the parties.

e. **Employees**. On the closing date, Debtor shall terminate all employees. Buyer may in its discretion offer employment on an at will basis to any or all of such employees. Employment shall be offered to the Debtor's principals pursuant to an employment agreement to be entered into post-closing.

f. **Non-Competition**. For a period of five years post-closing, neither the Debtor nor its members shall engage in a competing business in the United States.

g. **Conditions**:

1. The Bankruptcy Court shall have entered a final order approving the sale free and clear of all liens, claims, encumbrances, and other interests, and found that the buyer is a good-faith purchaser.

2. The Debtor and its members shall have complied with all agreements, covenants and conditions required by the Agreement, and delivered all documents required by the Agreement.

3. The buyer shall have received all permits and approvals necessary for it to conduct the business as conducted by seller.

4. The buyer shall have been assured a full discharge of the debts and liens relating to the Assets such that buyer shall not have successor liability.

5. The members shall have been fully released from any guaranty obligations relating to the Debtor's business, including, without limitation, the existing SBA loan.

6. The members and other key employees of the Debtor shall have entered into employment agreements with Buyer acceptable in buyer's discretion.

h. **Indemnity**. The Debtor and its members are to indemnify buyer against any liabilities of the Debtor, and any losses incurred relating to any inaccuracy or breach of any

representations or warranties of the Debtor or its members, or any breach of any covenant, agreement or obligation of the Debtor or its members.

   i. **Termination**. The Agreement may be terminated by the mutual written agreement of the parties, or by written notice by a party of a breach of the Agreement by the other, or if a closing does not occur by March 1, 2018. It has not been terminated.

   j. **Costs.** Each party is to bear its own costs, fees and expenses incurred in the consummation of the sale.

   k. **No Solicitation of Other Bids**. Neither the Debtor nor its members are to solicit other bids.

  16. The Buyer has no connection with the Debtor, and is not an insider as that term is defined in 11 U.S.C § 101(14). The Debtor believes that the Buyer is a good faith Buyer as that term is used in 11 U.S.C. § 363(m).

  17. The Assets are encumbered by a lien held by BNB Bank in the outstanding amount of $1,593,575.77.

  18. BNB Bank has consented to releasing its lien on $20,000 of the sale proceeds, which will benefit the estate, with the proviso that $10,000 shall be reserved for the payment of unsecured claims and $10,000 shall be reserved for the payment of the debtor's attorneys' fees.

### LOCAL RULES 6004-1(c)(1)(c) and (5)(A)

  19. This Motion and the Notice of Sale attached as **Exhibit D** will be served by the court-approved notice procedure upon the U.S. Trustee, creditors holding liens, all parties that have filed notices of appearance, and all creditors.

  20. The Debtor is unaware of any potential purchasers of the Assets that should receive notice of the proposed sale.

**WHEREFORE**, the Debtor respectfully prays:

1. That this Court authorize the Debtor's motion or a sale of the Assets to EGP free and clear of all claims, liens, mortgages, security interests, charges, encumbrances, and other interests of record, pursuant to the provisions of this Motion under §§ 363(b) and (f);

2. That all encumbrances shall attach to the Debtor's proceeds of the sale, to the extent that they are valid and perfected, in the same priority as they are entitled to under applicable law, with $20,000 of the sale proceeds being free and clear of encumbrances so that $10,000 will be reserved for unsecured creditors and $10,000 will be reserved for the payment of the debtor's attorneys' fees;

3. That the Debtor be authorized to execute all documents necessary to complete the sale;

4. For such further relief as this Court deems just and proper.

July 19, 2018

GUARINO & CO. LAW FIRM, LLC

BY: _____
Philip L. Guarino

26 Park Street, Suite 2057
Montclair, NJ 07042
973/509-1791
guarinolaw@gmail.com
Attorneys for Debtor-in-Possession

6

# EXHIBIT A

# Evergreen Products LLC

9-11 Anthony Street | Newark, NJ 07107

| QTY. | DESCRIPTION | LIQUIDATION VALUE |
|------|-------------|-------------------|

**Office Furniture :**

**1**

Contents consisting of:

3-Standard office style desk
1-Reception style chair
2-Executive style office chairs
2-Two drawer 4' metal filing cabinet
1-Mirror 2' x 4'
1-Cork board 4' x 8'

$225.00

**Conference Room Furniture:**

**1**

Contents consisting of:

1-Wood conference table w/ four chairs
1-Leather couch
2-White boards

$425.00

**Server Room Furniture:**

**1**

Contents consisting of:

1-Office desk w/ chair
1-Three Drawer metal filing cabinet
1-Book case
1-Sentry Safe

$125.00

**Main, Conference & Secondary Office Technology:**

1

Contents consisting of:

6-Assorted Dell PCs w/ mouse &.keyboard ( Optiplex 790 (2), Vostro DM11, Inspiron (3))
7-Assorted monitors: 17", (3) 19", 23", 24", 39"
1-Dewalt DCT414 12V max Li-Ion Infrared Thermometer retail $150
1-DuroZone M-4000 HVAC Digital Analyzer
6-Samsung DS-5014D OfficeServ digital business phones
2-Dell printers:  3335dn, 1350cnw
1-Fujitsu 0300 "snapscan" scanner
1-Fellows standard paper shredder

$550.00

**Server Room Technology:**

1

Contents consisting of:

1-Poweredge server T110 II w/ monitory. keyboard & mouse
1-Everfocus surveillance system including dvr (edvr4d1)
1-Samsung OfficeServ 7100 VOIP telephone System
1-Assortment of switches and routers: Verizon M1424WR, Cisco WAP4410N, 2 Netgear
switches

$300.00

**Kitchen Appliances:**

1

Contents consisting of:

1-Whirlpool refrigerator
1-Avanti microwave
1-Primo water cooler
1-Keureg coffee maker
1-Delonghi coffee maker
1-Dirt devil vacuum
1-Soleus floor heater

$225.00

**Office Supplies**

1

Contents consisting of:

1-Brother P-Touch label maker
14-Reams of paper
1-Staplers, paper clips, tape, envelopes, pens etc
1-Toilet paper & paper towels
1-Assorted shipping materials

## Warehouse Office related equipment and supplies

$150.00

1

Contents consisting of:

1-Assorted furniture:  chairs, desks, tables, cubicle dividers etc
1-Assorted electronics:  Dell Inspiron, microwave & mini-refrigerator
8-Armaflex APT05838 5/8 in. x 3/8 in. Rubber Pipe Insulation
7-Knauf Insulation board 1" x 24" x 48"
3-Air filters 13x24x1 60/case

## Warehouse Fixtures & Shelves

$825.00

1

Contents consisting of:

13-Sections of pallet racking:  8' x 15'
14-Assorted metal shelves
2-Plastic shelves
4-Conveyer system 24" wheel based, collapsible & fixed
5-Rolling work tables

$1,700.00

## Warehouse  Material Handling equipment

1

Contents consisting of:

3-Manual pallet jacks
2-Flatbed carts
5-Flat dollies
2-U-line strapping carts w/ accessories

$400.00

## Warehouse Tools

1

Contents consisting of:

1- assortment of hand tools:  drill press, grinder, cordless screw guns, heat gun, chop saw,
circular saw, 9 gal. shop vac (2), 2.5 Gal shop vac (4), Inficon digital scale, tool chest w hand
tools, refrigerant sniffer, refrigerant recovery unit, assorted ladders (6), fixed air compressor,
mobile air compressor, 26" craftsman snowblower, 28", shovels, brooms, warehouse fan and
assorted hand tools  throughout room.

$600.00

## Inventory Scrap

1

Contents consisting of:

89-Galvinized 52" enclosures
95-42" coils/cradles
37-36" coils/cradles
 3-Galvanized 48" enclosures
 6-52" Galvanized side vent panels
316-Discharge grills galvanized
114-Discharge grills aluminum
 46-36" Galvanized Sleeves
 59-42" Galvanized Sleeves
 4-Custom galvanized sleeves
 11-Pallets of scrap air conditioners
120-Main control or computer boards
233-Fan blades- plastic

$200.00

## Evergreen Air Conditioner Inventory

1

Contents consisting of:

2-Evergreen EGZ0071 -Air conditioner 7,000 BTU, 115V
47-Evergreen EGZ0091- Air conditioner 9,000 BTU, 115V
54-Evergreen EGZ0121- Air conditioner 12,000 BTU, 115V
5-Evergreen EGN0072- Air conditioner 7,000 BTU, 230V
2-Evergreen EGN0092- Air conditioner 9,000 BTU, 230V
5-Evergreen EGN0122- Air conditioner 12,000 BTU, 230V
12-Evergreen EGZ0152- Air conditioner 15,000 BTU, 230V
4-Evergreen KFTHD-09-ID Air conditioner 9,000 BTU
2-Evergreen KFTHD-24-OD Condenser 24,000BTU
4-Evergreen KFTHD-24-ID Air conditioner 24,000 BTU
1-Evergreen KFTHD-18-ID Air conditioner 18,000 BTU
1-Evergreen KFTHD-18-OD Condenser 18,000 BTU

## Sharp Air Conditioner Inventory

$5,000.00

1

Contents consisting of:

22-Sharp AE-X09PU-Air conditioner 9,000 BTU, 115V
1- Sharp AE-X12PU-Air conditioner 12,000 BTU, 115V
18-Sharp AE-X15PU-Air conditioner 15,000 BTU, 115V
5-Sharp AE-X2M20RU
3-Sharp AE-X4M30RU
2-Sharp XPC07PU
10-Sharp XPC09PU
3-Sharp XPC15PU

## Air Conditioner parts and accessories

$9,000.00

1

Contents consisting of:

335-Compressors- Various makes & models (most of which are the R22)
216-Evaporator fan motors 115v & 208v (egz-12, egn-18)
48-Air conditioner fan motors 115v & 208V

**Air Conditioner parts and accessories (cont.)**

    100-115V line cords
     30-208V line cords
    250-265V line cords
    600-115V & 208V transformers ( ete09038 & ETE09039)

                                                  $3,000.00

## Vehicles and Forklifts:

| | | |
|---|---|---|
| 1 | 2012 Isuzu NPR Box truck:  101,435 miles, JALC4W16C7000154 | $10,000.00 |
| 1 | 2006 GMC Savana Van:  96,000 miles, 1GTGG25V061246575 | $3,000.00 |
| 1 | 2011 Chevrolet Equinox LS:  105,000 miles  2CNFLCECXB6438147 | $4,500.00 |
| 1 | Hyster forklift: A349095, w/ side-shift (not working) | $300.00 |
| 1 | Clark Forklift: GCS/I7S, G127-0097-8920KOF 350olbs 7591hrs Triple mast w/ side-shift | $2,000.00 |

Liquidation value:                                    **$42,525.00**

**EXHIBIT B**

Auctioneers * Appraisers * Liquidators



Evergreen products LLC
9-11 Anthony Street | Newark, NJ 07107
Phone: 718.803.2090

File No.: A3702
Re: Assets Appraisal

October 16, 2017

Dear Mr. Korte,

In accordance with your request, we have appraised the above
referenced assets/inventory. The report of that appraisal is attached.

The purpose of this appraisal is to formulate an opinion of these
assets, its condition, salability and fair market liquidation value.

.
This report is based on an on-site, physical analysis of the assets. Our
report also includes an analysis of the current economic conditions as
it relates to this industry and specifically the equipment/inventory
outlined in the following pages.

We evaluated the assets based on two separate approaches: "Market"
and "Cost Approach." "Market approach" considers prices recently
paid for similar items, with adjustments made to reflect product
condition, sales concessions and utility of the comparable sales. This
approach is appropriately employed when valuing assets that are
commonly bought and sold at "arm's length" and are traded with
reasonable frequency, which covers the vast majority of these assets.

"Cost approach" is used for valuing assets, which are more specialized
and not commonly traded. Under this approach, the cost to replace
the asset in question is considered. From this amount, an allowance is

deducted for the total loss in value, due to any depreciation or obsolescence, whether arising from physical, functional or economic causes.

The tools and informational sources we utilized to properly value the equipment using the "Market approach" included but were not exclusive to:

- Current listing prices for the same or similar items.
- Recent auction results both live and on-line
- Published price guides/catalogs
- Dealer quotes
- Liquidation offerings

As "real world" appraisers, whom are also liquidators and auctioneers, we rely heavily on information acquired through our own sales as well as industry offerings.

Additionally, we considered factors such as: age, condition, superannuated or antiquated nature of goods, replacement cost, salability and the functionally specific nature of the inventory.

As requested we have appraised this inventories value by its "Forced Liquidation value."

**Forced Liquidation Value**:  Assets are marketed through an abbreviated process in which the inventory must be sold and removed within a shortened and  inflexible time frame, usually to a liquidation company.

We have concluded that the inventory outlined in the following pages has a fair market:

## Forced liquidation value of: $42,525

The current market condition for the resale of used office furniture, office machines, office equipment and general scrap is "Poor." The current market condition for the resale of warehouse equipment & supplies, forklifts, vehicles and inventory is "Average."

Although office furniture and electronics trade regularly, their low resale value is largely due to the disproportionate gap between the number of sellers and buyers. Plainly said, there is a glut of quality, used office furniture/equipment & electronics available and very few startups or expansions to purchase it.

Much of the "inventory" consists of "parts": fans, motors, compressors and line cords. These assets, while somewhat generic in nature, are slow moving, abundant and difficult to market.

The "scrap" is bulky and is predominantly galvanized steel. The current market value for this product is "Low" and the cost to handle and/or de-manufacture is relatively high. In other words, the cost to process the scrap equals or exceeds the value of the scrap.

The bulk of the inventory consists of two types of air-conditioners: PTAC (Packaged Terminal Air Conditioners) made by Evergreen and Sharp split units or "Minisplits." Both air conditioners types require professional installation and demand cumbersome marketing solutions.

The Evergreen inventory is primarily used on "new" construction which allows for its specific size and plumbing/electrical requirements. Furthermore, this inventory is old and has been discontinued by the manufacturer and can no longer be reordered. Competing installation companies will be very cautious to purchase this "one shot deal" without manufacture support, warranty and the ability to reorder for damaged units and continued business. The price incentive would have to be extreme, since a lower cost, is all this product can potentially offer.

The Sharp inventory, utilizes a two-piece design, in which an outside condenser is attached to an inside "head unit(s)." The current inventory being valued is heavily lopsided and includes far more of the outside condensers and much fewer "head units." It would be far better if this was reversed as the condensers are capable of handling more than one "head unit." The current inventory allows for a maximum of 13 complete units with only one head attached. Many installations would require more than one head unit and thus reducing this number even further.

Furthermore, Sharp has discontinued this product line and there are no additional units to purchase and there is no current product which can be retrofitted to make these older units functional. Also, it is our understanding that the condensers are highly specific and no other "head units", from other manufactures can be substituted. This severely limits their value since it is only salable to companies/individual which might have the other half or are in need of repair/replacement.

The vehicles and forklifts are staple and easily sold. There is some risk, as we were not able to test all functions of each. We assumed that all was in good working order other than the Hyster, which would not start.

In conclusion, some assets liquidate much better than others. When we consider the totality of these assets, other than the vehicles, we have assigned a relatively low liquidation value. In addition to the highly specific nature of the inventory and its incompleteness, the ancillary costs associated with these assets are very high. They are bulky and relatively inexpensive. The cost to move, warehouse, inventory and market makes it challenging and adversely affects its value.

It has been a pleasure to assist you. Please do not hesitate to contact me or any of my staff if we can be of additional service to you.

Sincerely,

Barry Goldstein
President
38 Richboynton Rd
Dover, New Jersey 07801
Phone 973-343-6684
Email: barryg@idealtrade.com

## APPRAISER'S CERTIFICATION

The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a complete visual inspection of the inventory.

3. I developed my opinion of the market value of the inventory that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment.

4. I considered comparable sales that are locationally, physically, and functionally the most similar to the subject property.

5. I have knowledge and experience in appraising this type of property in this market area.

6. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

7. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

8. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

9. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event.

10. I personally prepared all conclusions and opinions about the property that were set forth in this appraisal report. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

**EXHIBIT C**

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "Agreement") is dated as of October 27, 2017 (the "Effective Date"), by and between **EVERGREEN PRODUCTS, LLC**, a New York limited liability company, and **METRO AIR, LLC**, a New Jersey limited liability company (collectively, the "Seller"), **CHRISTOPHER POWIS** and **TODD CORTE** (the "Members"), and **EGP ENTERPRISES, LLC**, a Pennsylvania limited liability company ("Buyer").

WHEREAS, Seller is engaged in the business of manufacturing, producing, selling and installing air conditioning, heating and climate control products (the "Business");

WHEREAS, the Members own 100% of the membership interests of the Seller; and

WHEREAS, Seller wishes to sell and assign to Buyer, and Buyer wishes to purchase and assume from Seller, substantially all the assets of the Business, subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual benefits to be derived from this Agreement and of the representations, warranties, conditions, agreements and promises contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1        For the purposes of this Agreement, each of the following terms shall have the following respective meanings:

"Action" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

"Applicable Law" means, with respect to any Person, any domestic or foreign, federal, provincial, state or local statute, law, ordinance, rule, regulation, Order, writ, injunction, judgment, decree or other requirement of any Governmental Authority applicable to such Person or any of its Affiliates or any of their respective properties, assets, officers, directors or employees (in connection with such officer's, director's or employee's activities on behalf of such Person).

"Business Day" means any day other than a Saturday, Sunday or other day on which banks in New York City are required to be closed.

"Closing Documents" means the Bill of Sale, the Assignment and Assumption Agreement, and the other agreements, instruments and documents required to be delivered at Closing.

"Competing Business" means any Person which competes, or assists or supports another to compete, with the Business of Seller in the Territory.

"Code" means the United States Internal Revenue Code of 1986, as amended.

1

"Governmental Authority" means any foreign, United States federal, state, local, provincial or municipal government or any subdivision thereof, any regulatory or administrative authority, or any agency or commission or any court, tribunal or judicial or arbitral body.

"Indebtedness" with respect to any Person means (i) any indebtedness or other obligation for borrowed money; (ii) obligations (whether or not such Person has assumed or become liable for the payment of such obligation) secured by Liens on property owned by such Person; (iii) all guarantees and similar obligations of such Person; and (iv) all interest, prepayment premiums and penalties, and any other fees, expenses, indemnities and other amounts payable as a result of the prepayment or discharge of any Indebtedness.

"Intellectual Property" means all of the following in any jurisdiction throughout the world: (i) trademarks, trade names, copyrights, patents and internet domain names, together with all goodwill associated with any of the foregoing, and applications, registrations and renewals in connection therewith; and (ii) trade secrets and confidential business information.

"Inventory" means all stock in trade, merchandise, goods, supplies and other products owned by Seller related to the Business for resale in the Ordinary Course of Business including all raw materials, work-in-process, and finished products.

"Liability" means any liability or obligation (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or un-accrued, liquidated or un-liquidated, and due or to become due and regardless of when asserted).

"Lien" means any lien (statutory or otherwise), encumbrance, pledge, charge, security interest, mortgage, or other encumbrance of any kind or nature whatsoever.

"Losses" means losses, damages, liabilities, deficiencies, Actions, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers.

"Order" means any decree, order, injunction, rule, judgment or consent of or by any Governmental Authority.

"Ordinary Course of Business" means the ordinary course of business of Seller consistent with past custom and practice

"Permits" means all municipal, state, federal, local and foreign consents, Orders, filings, franchises, permits, approvals, certificates, licenses, agreements, waivers, and authorizations held or used in connection with, or required for, the Business or the Acquired Assets.

"Person" means any person, firm, corporation, partnership, joint venture, limited liability company, association or other entity (governmental or private).

"Representative", with respect to any Person, means its' attorneys, accountants, agents, consultants or other representatives.

"Tax" and, with correlative meaning, "Taxes" means with respect to any Person all federal, state, local, county, foreign and other taxes, assessments or other government charges or tax of any kind whatsoever, together with any interest, penalty, addition to tax or additional amount imposed by any Governmental Authority responsible for the imposition of any such tax (domestic or foreign) whether

2

such Tax is disputed or not.

"Tax Return" means any report, return, declaration, claim for refund or other information or statement supplied or required to be supplied by Seller relating to Taxes, including any schedules or attachments thereto and any amendments thereof.

"Territory" means the United States of America.

"Third Party" means any Person other than Seller, the Members or Buyer.

The following terms used in this Agreement shall have the meanings set forth in the corresponding Articles, Sections or subsections of this Agreement:

| | |
|---|---|
| "Accounts Receivable" | Section 2.1 (ii) |
| "Acquired Assets" | Section 2.1 |
| "Acquired Intellectual Property" | Section 2.1 (iii) |
| "Agreement" | Recitals |
| "Assignment and Assumption Agreement" | Section 2.6 |
| "Assumed Contracts" | Section 2.1 (ix) |
| "Bill of Sale" | Section 2.6 |
| "Books and Records" | Section 2.1 (xv) |
| "Business" | Recitals |
| "Buyer" | Recitals |
| "Buyer Indemnitees" | Section 7.1 |
| "Closing" | Section 2.7 |
| "Closing Date" | Section 2.7 |
| "Excluded Assets" | Section 2.2 |
| "Excluded Liabilities" | Section 2.4 |
| "Fixed Assets" | Section 2.1(iv) |
| "Members" | Recitals |
| "Purchase Price" | Section 2.5 |
| "Seller" | Recitals |
| "Seller Indemnitees" | Section 7.2 |

## ARTICLE 2
## PURCHASE AND SALE OF ASSETS

2.1 **Purchase and Sale of Acquired Assets**. Upon the terms and subject to the conditions contained herein, at the Closing, Seller shall sell, convey, transfer, assign and deliver to Buyer, free and clear of any and all Liens, and Buyer shall purchase and accept from Seller, all right, title and interest of Seller in and to the following assets owned or leased by Seller as of the Closing Date used or useable in connection with the Business and the operation thereof, be they real or personal, tangible or intangible, fixed or current, (all of the assets to be sold, conveyed, transferred, assigned and delivered to Buyer hereunder, the "Acquired Assets"):

(i) all cash and cash equivalents;

(ii) all accounts or notes receivable held by Seller and any security, claim, remedy or other right related to any of the foregoing ("Accounts Receivable");

3

(iii)    Seller's rights in and to all Intellectual Property used by Seller in the Business, including the name "Evergreen Products" and "Metro Air" (the "Acquired Intellectual Property");

(iv)    all equipment, machinery, fixtures, furniture, furnishings, vehicles, computer equipment and telephone equipment owned by Seller (collectively, the "Fixed Assets");

(v)    all Inventory;

(vi)    all office supplies;

(vii)    all advertising, marketing and promotional materials;

(viii)    all transferable Permits, licenses, certifications and approvals from all permitting, licensing, accrediting and certifying agencies;

(ix)    the agreements and contracts of Seller described on **Schedule 2.1 (ix)** hereof (the "Assumed Contracts");

(x)    all telephone numbers and internet domains;

(xi)    all rights to any Actions of any nature available to or being pursued by Seller to the extent related to the Business or the Acquired Assets, whether arising by way of counterclaim or otherwise;

(xii)    all prepaid expenses, credits, advance payments, claims, security, refunds, rights of recovery, rights of setoff, rights of recoupment, deposits, charges, sums and fees (including any such item relating to the payment of Taxes);

(xiii)    all of Seller's rights under warranties, indemnities and all similar rights against Third Parties to the extent related to the Business or any Acquired Assets;

(xiv)    all insurance benefits, including rights and proceeds, arising from or relating to the Business or the Acquired Assets;

(xv)    originals, or where not available, copies, of all books and records, including, but not limited to, books of account, ledgers and general, financial and accounting records, machinery and equipment maintenance files, mailing lists, customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), sales material and records (including pricing history, total sales, terms and conditions of sale, sales and pricing policies and practices), strategic plans, internal financial statements, marketing and promotional surveys, material and research and files relating to the Acquired Intellectual Property ("Books and Records"); and

(xvi)    all intangible assets, including without limitation, deposit accounts, securities, investment property, financial assets, chattel paper, letters-of-credit, and the goodwill and going concern value of the Business.

2.2    **Excluded Assets**. Notwithstanding anything in this Agreement to the contrary, Seller shall retain, and Buyer shall not acquire, any of Seller's right, title and interest in and to (the "Excluded Assets"):

4

(a)     All Tax Returns of Seller and all Tax refunds due Seller from any Governmental Authority.

(b)     The minute books, membership books, corporate seal and other corporate records of Seller relating to its organization and existence.

(c)     All original accounting and business records of Seller (provided, however that Buyer shall have the right to review and copy accounting and business records of Seller to the extent reasonably required by Buyer to continue the operation of the Business after the Closing).

(d)     Contracts other than Assumed Contracts;

(e)     All benefit plans and assets attributable thereto;

(f)     The rights which accrue or will accrue to Seller or the Members under the Closing Documents.

2.3     **Intentionally Deleted.**

2.4     **Excluded Liabilities**.   Notwithstanding anything contained herein to the contrary, all Liabilities and obligations of Seller (collectively, the "Excluded Liabilities") shall remain the liabilities and obligations of Seller and are not assumed by Buyer.  Seller hereby agrees that it shall fully and timely pay, perform and discharge all the Excluded Liabilities in accordance with their respective terms.  The covenants of the Seller in this Section 2.4 are for the sole benefit of the Buyer and shall survive the Closing but shall not be enforced or enforceable by any creditor or other Third Party.

2.5     **Purchase Price**.   The purchase price for the Purchased Assets (the "Purchase Price") shall be Fifty Thousand and 00/100 Dollars ($50,000.00) in cash paid at Closing by Buyer to Seller.

2.6     **Closing Documents.**   At Closing:

(a) Seller shall execute and deliver a bill of sale in favor of Buyer in substantially the form attached as **Schedule 2.6 (a)** (the "Bill of Sale"), conveying title to the Fixed Assets, Inventory and other tangible Acquired Assets.

(b)     Seller shall execute and deliver an assignment in favor of Buyer in substantially the form attached as **Schedule 2.6 (b)** (the "Assignment") assigning Seller's interest in the intangible Acquired Assets.

(c)     Seller and Buyer shall execute and deliver an Assignment and Assumption Agreement with respect to the Assumed Contracts in substantially the form attached as **Schedule 2.6 (c)** (the "Assignment and Assumption Agreement").

(d)     Seller and Buyer shall deliver corporate resolutions authorizing the transactions contemplated by this Agreement.

(e)     The parties shall deliver such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Buyer, as may be required to give effect to this Agreement.

5

2.7     **Closing**. Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement (the "Closing") shall occur by mail or overnight delivery or other delivery agreed upon by the parties, with a wire transfer of the Purchase Price. Closing shall be held on such date as may be mutually agreed upon by the parties in writing, provided that all of the conditions to Closing set forth in Article 6 are either satisfied or waived (other than conditions which, by their nature, are to be satisfied on the Closing Date).. The date on which the Closing is to occur is herein referred to as the "Closing Date".

2.8     **Possession**. At Closing, Seller shall deliver to Buyer the Fixed Assets, Inventory and other tangible Acquired Assets.

2.9     **Post Closing Assurances**. Seller and Buyer shall execute, acknowledge, deliver or file all further acts, transfers or assurances as may be reasonably required for the proper, complete and/or better transferring, conveying, assigning and assuring to Buyer, or for the aiding and assisting in the reducing to possession by Buyer, of any of the Acquired Assets, including but not limited to the Assumed Contracts.

2.10    **Third Party Consents**. To the extent that Seller's rights under any contract or Permit constituting an Acquired Asset, or any other Acquired Asset, may not be assigned to Buyer without the consent of another Person which has not been obtained, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful, and Seller, at its expense, shall use its reasonable best efforts to obtain any such required consent(s) as promptly as possible. If any such consent shall not be obtained or if any attempted assignment would be ineffective or would impair Buyer's rights under the Acquired Asset in question so that Buyer would not in effect acquire the benefit of all such rights, Seller, to the maximum extent permitted by law and the Acquired Asset, shall act after the Closing as Buyer's agent in order to obtain for it the benefits thereunder and shall cooperate, to the maximum extent permitted by Law and the Acquired Asset, with Buyer in any other reasonable arrangement designed to provide such benefits to Buyer.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF SELLER AND MEMBERS

Seller and the Members hereby represent and warrant to Buyer as follows:

3.1     **Organization**. Seller consists of limited liability companies duly organized, validly existing and in good standing under the laws of the state of their formation and has the power and authority and all necessary governmental approvals to carry on the Business as it is now being conducted and to enter into this Agreement and to carry out its obligations hereunder.

3.2     **Authority; Binding Agreements**. The execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement have been duly and validly authorized by all necessary actions on the part of Seller. Seller has all requisite power and authority to execute and deliver this Agreement and to consummate the transactions contemplated by this Agreement. This Agreement and the Closing Documents have been, or upon execution and delivery thereof will be, duly executed and delivered by Seller. This Agreement is, and the Closing Documents upon the execution and delivery thereof will be, valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms.

3.3     **Conflicts**. Neither the execution and delivery of this Agreement nor any of the Closing Documents, the consummation of the transactions contemplated hereby or thereby nor compliance by Seller with any of the provisions of this Agreement or the Closing Documents will violate any law,

6

statute, rule, regulation, Order or writ, applicable to Seller or any of Seller's assets or conflict with, result in any breach of any of the terms, conditions or provisions of, or result in a violation of, the articles of incorporation, by-laws or other constitutive documents of Seller or any of the Assumed Contracts.

3.4     **Acquired Assets, Property, and Related Matters**.  Seller has good and marketable title to, or a valid and subsisting leasehold interest in the tangible Acquired Assets, free and clear of all Liens. The tangible Acquired Assets owned or leased by Seller, constitute substantially all of the tangible assets used by Seller in the conduct of the Business.  At Closing good, valid and marketable title to all of the tangible Acquired Assets shall be transferred by Seller to Buyer, free and clear of all Liens.  The Acquired Assets constitute substantially all of the assets, tangible and intangible, real and personal of any nature whatsoever necessary to operate the Business in the manner presently operated by Seller, other than the Existing Lease.

3.5     **Taxes**.  There is not and there has not been any dispute or claim concerning any Tax liability of Seller claimed, raised or threatened by any taxing authority.

3.6     **Intellectual Property**.  The operation of the Business by Seller does not infringe any intellectual property right of any other Person.   No litigation is pending or, to Seller's knowledge, threatened against Seller for the infringement of any intellectual property right owned or allegedly owned by any other party.  No current or former employees or independent contractors of Seller have any lawful and valid claims or rights to any of the Intellectual Property included in the Acquired Assets.

3.7     **Litigation.**  Other than those previously disclosed to Buyer in writing, there are no suits, actions, claims, orders, charges, complaints, investigations or Actions in respect of Seller or any of the Acquired Assets, pending or, to Seller's knowledge, threatened, whether at law or in equity, or before or by any Governmental Authority against Seller, any of the Acquired Assets, or the Business.

3.8     **Compliance with Laws**.  No notices have been received by, and no claims have been filed against, Seller alleging a violation of any Applicable Laws.  Seller has complied in all material respects, and is in material compliance, with all Applicable Laws.

3.9     **Brokers**.  No agent, broker, person or firm acting on behalf of Seller is or will be entitled to any broker's or finder's fee or any other commission or similar fee directly or indirectly from any of the parties to this Agreement in connection with the transaction contemplated by this Agreement.

3.10     **Financial Information**.  Seller has provided to Buyer accurate monthly bank statements and daily closing reports with respect to the Business.  All projections, estimates, financial plans or budgets previously delivered to or made available to Buyer were based upon reasonable assumptions in light of all material facts and circumstances at the time made and were provided to Buyer in good faith.

## ARTICLE 4
### REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as follows:

4.1     **Organization and Power**.  Buyer (i) is a limited liability company duly organized, validly existing and in good standing under the laws of the state of its formation, and (ii) has all requisite entity power and authority to carry on its business as now being conducted.

4.2     **Authority; Binding Agreements**.  The execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement have been duly and validly authorized

7

by all necessary actions on the part Buyer. Buyer has all requisite power and authority to execute and deliver this Agreement and to consummate the transactions contemplated by this Agreement. This Agreement and the Closing Documents have been, or upon execution and delivery thereof will be, duly executed and delivered by Buyer. This Agreement is, and the Closing Documents upon the execution and delivery thereof will be, valid and binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms.

4.3     **Brokers**. No agent, broker, person or firm acting on behalf of Buyer is or will be entitled to any broker's or finder's fee or any other commission or similar fee directly or indirectly from any of the parties to this Agreement in connection with the transaction contemplated by this Agreement.

## ARTICLE 5
## ADDITIONAL AGREEMENTS AND COVENANTS

5.1     **Cooperation on Tax Matters**. After the Closing, Buyer and Seller shall furnish to each other, upon request, such information and assistance relating to the Business and the Acquired Assets (including, without limitation, access to books and records) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any taxing authority, and the prosecution of any defense or claim, suit or proceeding relating to any Tax. Buyer and Seller shall cooperate with each other in the conduct of any audit or other proceeding relating to Taxes involving the Acquired Assets or the Business.

5.2     **Transfer Taxes**. Notwithstanding anything in this Agreement to the contrary, Seller shall pay any sales, use and other transfer Taxes arising in connection with the transfer of the Acquired Assets under this Agreement.

5.3     **Expenses**. Each party to this Agreement shall bear its own costs, fees and expenses, including attorney, accountant and other consultant fees, incurred in connection with the execution and negotiation of this Agreement and the consummation of the transactions contemplated by this Agreement.

5.4     **No Solicitation of Other Bids**. Seller shall not, and shall not authorize or permit any of its Affiliates or any of their Representatives to, directly or indirectly, (i) encourage, solicit, initiate, facilitate or continue inquiries regarding acquisition of the interests or assets of Seller by a Third Party, (ii) enter into discussions or negotiations with, or provide any information to, any Person concerning a possible acquisition proposal, or (iii) enter into any agreements or other instruments regarding an acquisition proposal. Seller shall immediately cease and cause to be terminated, and shall cause its Affiliates and all of its and their Representatives to immediately cease and cause to be terminated, all existing discussions or negotiations with any Persons conducted heretofore with respect to, or that could lead to, an acquisition proposal.

5.5     **Employees**. Commencing on the Closing Date, Seller shall terminate all employees of the Business and, at Buyer's sole discretion, Buyer may offer employment, on an "at will" basis, to any or all of such employees. Seller shall offer employment to the Members pursuant to an employment agreement to be executed after Closing. Seller shall bear any and all obligations and liability under the WARN Act resulting from employment losses pursuant to this Section 5.5. Seller shall be solely responsible, and Buyer shall have no obligations whatsoever for, any compensation or other amounts payable to any current or former employee, officer, director, manager, contractor or consultant of the Business, including, without limitation, hourly pay, commission, bonus, salary, accrued vacation, fringe, pension or profit sharing benefits or severance pay for any period relating to employment with or service to Seller prior to the Closing Date.

5.6     **Confidentiality**. From and after Closing, Seller and the Members shall, and shall cause their Affiliates to hold, and shall use reasonable best efforts to cause its or their respective Representatives to hold, in confidence any and all information, whether written or oral, concerning the Business, except to the extent that Seller and/or the Members can show that such information (i) is generally available to and known by the public through no fault of Seller, the Members or any of their Affiliates or their respective Representatives, or (ii) is lawfully acquired by Seller, the Members, any of their Affiliates or their respective Representatives after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation. If Seller, the Members or any of their Affiliates or their respective Representatives are compelled to disclose any information by judicial or administrative process or by other requirements of Law, Seller and/or the Members shall promptly notify Buyer in writing and shall disclose only that portion of such information which Seller is advised by its counsel in writing is legally required to be disclosed, provided that Seller shall use reasonable best efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be afforded such information.

5.7     **Non-Competition; Non-Solicitation**. For a period of five (5) years commencing on the Closing Date (the "Restricted Period"), Seller and the Members shall not, and shall not permit any of their Affiliates to, directly or indirectly, (i) engage in or assist others in engaging in a Competing Business in the Territory, (ii) have an interest in any Person that engages directly or indirectly in a Competing Business in the Territory in any capacity, including as a partner, shareholder, member, employee, principal, agent, trustee or consultant, or (iii) cause, induce, solicit or encourage any material actual or prospective client, customer, supplier or licensor of the Business (including any existing or former client or customer of Seller and any Person that becomes a client or customer of the Business after Closing), or any other Person who has a material business relationship with the Business, to terminate or modify any such actual or prospective relationship. In addition, Seller and the Members shall not, and shall not permit any of their Affiliates to, directly or indirectly, hire or solicit any Person who is offered employment by Buyer pursuant to Section 5.5 or is or was employed in the Business during the Restricted Period, or encourage any such employee to leave such employment or hire any such employee who has left such employment, except pursuant to a general solicitation which is not directed specifically to any such employees. Notwithstanding anything herein to the contrary, the Members' provision of services to the Buyer and its Affiliates shall be excepted from the restrictions of this Section 5.7.

5.8     **Reasonableness of Restrictions**. The parties acknowledge that a breach or threatened of the covenants set forth in Sections 5.6 and 5.7 would give rise to irreparable harm to Buyer, for which monetary damages would not be an adequate remedy, and hereby agree that in the event of a breach or threatened breach by Seller or the Members of any such restrictions, Buyer shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction, without the requirement to post a bond. Seller and the Members acknowledge that the restrictions contained in Sections 5.6 and 5.7 are reasonable and necessary to protect the legitimate interests of Buyer and constitute a material inducement to Buyer to enter into this Agreement and consummate the transactions contemplated hereby.

5.9     **Public Announcements**. Unless otherwise required by Applicable Law, no party shall make any public announcements in respect of this Agreement or the transactions contemplated hereby or otherwise communicate with any news media without the prior written consent of the other party, and the parties shall cooperate as to the timing and contents of any such announcement.

9

## ARTICLE 6
## CONDITIONS TO CLOSING

6.1     **Conditions to Obligations of Buyer**.  The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Buyer's waiver, at or prior to Closing, of each of the following conditions:

(a)     The representations and warranties of Seller and the Members contained in Article 3 and elsewhere in this Agreement, the other Closing Documents and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date.

(b)     The Bankruptcy Court shall have entered a final order (which has not been stayed on appeal) approving this Agreement, and (i) authorizing Sell to transfer the Acquired Assets to the Buyer free and clear of all liens, claims, encumbrances, and other interests except as otherwise provided herein, and (ii) determining that Buyer is a good-faith purchaser.

(c)     Seller and the Members shall have duly performed and complied in all respects with all agreements, covenants and conditions required by this Agreement and each of the Closing Documents to be performed or complied with by it prior to or on the Closing Date.

(d)     Seller and the Members shall have delivered to Buyer duly executed counterparts to the Transaction Documents.

(e)     Buyer shall have received all Permits and approvals necessary for it to conduct the Business as conducted by Seller.

(f)     Buyer shall have been assured a full discharge of the debts and Liens relating to the Acquired Assets or the Business such that Buyer will not have successor liability.

(g)     The Members shall have been fully released from any guaranty obligations relating to the Business, including, without limitation, the existing SBA loan.

(h)     Seller and the Members shall have delivered to Buyer such other documents or instruments as Buyer reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement.

(i)     The Members and other key employees of the Business shall have entered into employment agreements with Buyer acceptable in Buyer's discretion.

6.2     **Conditions to Obligations of Seller**.  The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Buyer's waiver, at or prior to Closing, of each of the following conditions:

(a)     The representations and warranties of Buyer contained in Article 4 and elsewhere in this Agreement, the other Closing Documents and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date.

(b)     Buyer shall have duly performed and complied in all respects with all

10

agreements, covenants and conditions required by this Agreement and each of the Closing Documents to be performed or complied with by it prior to or on the Closing Date.

        (c)     Buyer shall have delivered to Seller and the Members duly executed counterparts to the Closing Documents.

## ARTICLE 7
## INDEMNITY

    7.1    **Indemnification by Seller and the Members**. Seller and the Members shall indemnify and hold harmless Buyer, its Affiliates, members, managers, employees, agents, successors and assigns (collectively, "Buyer Indemnitees") from and against any and all Liabilities of Seller, and Losses incurred or sustained by, or imposed upon, the Buyer Indemnitees based upon, arising out of, or relating to:

        (a)     any inaccuracy in or breach of any of the representations or warranties of Seller and the Members contained in this Agreement, the other Closing Documents or in any certificate or instrument delivered by or on behalf of Seller or the Members pursuant to this Agreement;

        (b)     any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Seller or the Members pursuant to this Agreement, the other Closing Documents or in any certificate or instrument delivered by or on behalf of Seller or the Members pursuant to this Agreement;

        (c)     any Excluded Asset or any Excluded Liability; or

        (d)     any Third Party Action or Loss based upon, resulting from or arising out of the Business or the Acquired Assets conducted, existing or arising on or prior to the Closing Date.

    7.2    **Indemnification by Buyer**. Buyer shall indemnify and hold harmless Seller and the Members, and their respective Affiliates, members, managers, employees, agents, successors and assigns (collectively, "Seller Indemnitees") from and against any and all Losses incurred or sustained by, or imposed upon, the Seller Indemnitees based upon, arising out of, or relating to:

        (a)     any inaccuracy in or breach of any of the representations or warranties of Buyer contained in this Agreement, the other Closing Documents or in any certificate or instrument delivered by or on behalf of Buyer pursuant to this Agreement; or

        (b)     any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Buyer pursuant to this Agreement, the other Closing Documents or in any certificate or instrument delivered by or on behalf of Buyer pursuant to this Agreement.

## ARTICLE 8
## TERMINATION

    8.1    **Termination**. This Agreement may be terminated at any time prior to Closing by:

        (a)     the mutual written agreement of the parties;

        (b)     written notice to the breaching party of a breach, inaccuracy or failure to perform any representation, warranty, covenant or agreement made by the breaching party pursuant to this Agreement, followed by a failure of the breaching party to cure such breach within fifteen (15) days of

11

the breaching party's receipt of written notice of such breach; or

        (c)    by Buyer or Seller if any of the conditions of Section 6.1(d), (e) and (f) have not been, or if it becomes apparent that any such conditions will not be, fulfilled by March 1, 2018.

        8.2    **Effect of Termination**. In the event of the termination of this Agreement in accordance with Section 8.1, this Agreement shall become void and there shall be no further liability on the part of any party hereto, except (a) as set forth in this Article 8, Section 5.6, Article 7 and Article 9 of this Agreement which shall survive such termination, and (b) that nothing herein shall relieve any party hereto from liability for any willful or grossly negligent breach of any provision of this Agreement.

## ARTICLE 9
## MISCELLANEOUS

        9.1    **Entire Agreement**. This Agreement, any contract terms expressly incorporated into this Agreement, and the schedules and exhibits to this Agreement contain the entire agreement between the parties with respect to the transactions contemplated by this Agreement and supersede all prior agreements or understandings between the parties.

        9.2    **Notices**. Any and all notices, requests, demands or other communications required to be given pursuant to this Agreement by any party shall be in writing and shall be validly given or made to the other party if served personally or by overnight courier. Service shall be deemed made at the time of delivery. The aforementioned communications and notices shall be sent to the parties' respective addresses as set forth below or to such other address as the party shall designate by written notice.

        9.3    **Counterparts**. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Any counterpart or other signature delivered by facsimile shall be deemed for all purposes as being good and valid execution and delivery of this Agreement by that party.

        9.4    **Benefits of Agreement**. All of the terms and provisions of this Agreement shall be binding upon and inure to the benefit of the parties to this Agreement and their respective successors and assigns. This Agreement is for the sole benefit of the parties to this Agreement and not for the benefit of any third party.

        9.5    **Amendments and Waivers**. No modification, amendment or waiver of any provision of, or consent required by, this Agreement, nor any consent to any departure from the terms of this Agreement, shall be effective unless it is in writing and signed by the parties to this Agreement. Any modification, amendment, waiver or consent shall be effective only in the specific instance and for the purpose for which it is given.

        9.6    **Assignment**. This Agreement and the rights and obligations under this Agreement shall not be assignable or transferable by any party to this Agreement without the prior written consent of the other party to this Agreement.

        9.7    **Governing Law**. This Agreement and all transactions contemplated herein shall be governed by, and construed and enforced in accordance with the internal laws of the State of New York, without regard to principals of conflicts of law. Each of the parties irrevocably and unconditionally agrees that any Action arising out of or relating to this Agreement shall be brought in the courts located in the State of New York. Each of the parties hereto consents to the jurisdiction of each such court in any

suit, action or proceeding and waives any objection which it may have to the venue of any such suit, action or proceeding in any such court.  If any provision of this Agreement or the application thereof to any person or circumstances shall for any reason and to any extent be invalid or unenforceable, the remainder of this Agreement and the application of that provision to other persons or circumstances shall not be affected, but rather it shall be enforced to the extent permitted by law.

9.8      **Severability**.   If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

9.9      **Successors and Assigns**.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

9.10      **Specific Performance**.   The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

[Signatures on following page]

13

IN WITNESS WHEREOF, each of the parties to this Agreement has caused this Agreement to be duly executed and delivered as of the day and year first above written.

"Buyer"                                         "Seller"

EGP ENTERPRISES, LLC,                           EVERGREEN PRODUCTS, LLC,
a Pennsylvania limited liability company        a New York limited liability company


By:_____                    By:_____
Name: Kaushal Majmudar                          Name: Christopher Powis
Title: Manager                                  Title: Manager-Member

**Address for Notices**:                        **Address for Notices:**

EGP Enterprises, LLC                            Evergreen Products, LLC
ATTN:  Kaushal Majmudar                         ATTN: Christopher Powis
623 Morris Avenue                               9-11 Anthony Street
Springfield, NJ 07081                           Newark, NJ 07107


                                                METRO AIR, LLC,
                                                a New Jersey limited liability company


                                                By:_____
                                                Name: Christopher Powis
                                                Title: Manager-Member

                                                **Address for Notices:**

                                                Metro Air, LLC
                                                ATTN: Christopher Powis
                                                9-11 Anthony Street
                                                Newark, NJ 07107

14

"Members"

By: _____

Name: Christopher Powis

**Address for Notices:**
9-11 Anthony Street
Newark, NJ 07107

By: _____

Name: Todd Korte

**Address for Notices:**
9-11 Anthony Street
Newark, NJ 07107

15

## Schedules

Schedule 2.1(ix)               Assumed Contracts

Schedule 2.6(a)               Bill of Sale for Tangible Assets

Schedule 2.6(b)               Assignment of Intangible Assets

Schedule 2.6(c)               Assignment and Assumption Agreement for Assumed Contracts

16

Schedule 2.1 (ix)

Assumed Contracts

Schedule 2.6 (a)

Bill of Sale

**Bill of Sale**

For good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, **EVERGREEN PRODUCTS, LLC**, a New York limited liability company, and **METRO AIR, LLC**, a New Jersey limited liability company (collectively, the "Seller"), does hereby grant, bargain, transfer, sell, assign, convey and deliver to **EGP ENTERPRISES, LLC**, a Pennsylvania limited liability company ("Buyer"), all of its right, title and interest in and to the Acquired Assets, as such term is defined in the Asset Purchase Agreement dated of even date herewith (the "Agreement"), by and between Seller and Buyer, to have and to hold the same unto Buyer, its successors and assigns, forever.

Buyer acknowledges that Seller makes no representation or warranty with respect to the assets being conveyed hereby except as specifically set forth in the Agreement.

Seller for itself, its successors and assigns, hereby covenants and agrees that, at any time and from time to time upon the written request of Buyer, Seller will do, execute, acknowledge and deliver or cause to be done, executed, acknowledged and delivered, all such further acts, deeds, assignments, transfers, conveyances, powers of attorney and assurances as may be reasonably required by Buyer in order to assign, transfer, set over, convey, assure and confirm unto and vest in Buyer, its successors and assigns, title to the assets sold, conveyed and transferred by this Bill of Sale.

IN WITNESS WHEREOF, Seller has duly executed this Bill of Sale as of October 27, 2017.

EVERGREEN PRODUCTS, LLC

By _____

Name:  Christopher Powis

Title:  Manager-Member

METRO AIR, LLC

By _____

Name:  Christopher Powis

Title:  Manager-Member

18

Schedule 2.6 (b)

Assignment of Intangible Assets

## ASSIGNMENT OF INTANGIBLE ASSETS

THIS ASSIGNMENT OF INTANGIBLE ASSETS (hereinafter "Assignment"), is made and entered into October 27, 2017, by **EVERGREEN PRODUCTS, LLC**, a New York limited liability company, and **METRO AIR, LLC**, a New Jersey limited liability company (collectively, the "Assignor"), does hereby grant, bargain, transfer, sell, assign, convey and deliver to **EGP ENTERPRISES, LLC**, a Pennsylvania limited liability company ("Assignee").

WHEREAS, simultaneously herewith Assignor is selling to Assignee the Acquired Assets of the Business, as such terms are defined in that certain Asset Purchase Agreement (the "Agreement") between Assignor and Assignee;

WHEREAS, Assignor desires to assign, transfer, set over, convey and deliver to Assignee Assignor's interest in to all Intangible Assets (as defined below) to the extent assignable or owned by Assignor and used in connection with the Acquired Assets and the Business. Any capitalized terms not defined herein shall have the meaning set forth in the Agreement.

NOW, THEREFORE, for and in consideration of the sum of Ten Dollars ($10.00) and for other good and valuable consideration, Assignor hereby assigns and transfers to Assignee all of Assignor's right, title, claim and interest, if any and to the extent assignable, in:

(i) all licenses, approvals, applications and permits issued or approved by any governmental authority and relating to the use, operation, ownership, occupancy, improvement and/or maintenance of the Business and the Acquired Assets;

(ii) all intangible assets, including without limitation, deposit accounts, securities, investment property, financial assets, chattel paper, letters-of-credit, and the goodwill and going concern value of the Business;

(iii) all Intellectual Property used by Seller in the Business, including the name "Evergreen Products" and "Metro Air"; all of Seller's rights under warranties, indemnities and all similar rights against Third Parties to the extent related to the Business or any Acquired Assets;

(iv) all insurance benefits, including rights and proceeds, arising from or relating to the Business or the Acquired Assets; and

(v) originals, or where not available, copies, of all books and records, including, but not limited to, books of account, ledgers and general, financial and accounting records, machinery and equipment maintenance files, mailing lists, customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), sales material and records (including pricing history, total sales, terms and conditions of sale, sales and pricing policies and practices), strategic plans, internal financial statements, marketing and promotional surveys, material and research and files relating to the Acquired Intellectual Property ("Books and

19

Records");

(collectively, the "Intangible Assets").

2.     To the extent any warranty or guaranty hereby assigned is not assignable, at Assignee's election, Assignor shall at no cost to Assignor execute such further instruments assigning the contracts or agreements related to the warranty or guaranty sought to be enforced.

3.     Assignor hereby acknowledges and agrees that all liabilities and obligations of Assignor, if any, in connection with the Intangible Assets accruing or arising prior to the date hereof are not being assumed by Assignee and that such liabilities and obligations are and shall continue to be the obligation of Assignor.

IN WITNESS WHEREOF, the Assignor has executed this Assignment as of the day and year first above written.

EVERGREEN PRODUCTS, LLC

By _____

Name:  Christopher Powis

Title:  Manager-Member

METRO AIR, LLC

By _____

Name:  Christopher Powis

Title:  Manager-Member

20

Schedule 2.6 (c)

Assignment and Assumption Agreement

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This ASSIGNMENT AND ASSUMPTION AGREEMENT, dated as of October 27, 2017 (this "Assignment and Assumption"), is by and between **EVERGREEN PRODUCTS, LLC**, a New York limited liability company, and **METRO AIR, LLC**, a New Jersey limited liability company (collectively, the "Assignor"), and **EGP ENTERPRISES, LLC**, a Pennsylvania limited liability company ("Assignee")

WHEREAS, Buyer and Seller are each a party to that certain Asset Purchase Agreement, dated as of the date hereof (the "Agreement"), pursuant to which Seller will sell to Buyer the Acquired Assets, which include the Assumed Contracts (as each are defined in the Agreement).

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

(i)      Assignment. Seller hereby sells, assigns, transfers and conveys to Buyer, to the extent that such are legally assignable, all of Seller's right, title and interest in, under and to the Acquired Assets, including, but not limited to, the Assumed Contracts, from and after the date hereof.

(ii)     Acceptance and Assumption. Buyer hereby (a) purchases and accepts the assignment, transfer and conveyance, to the extent that such are legally assignable, of Seller's right, title and interests in, under and to the Acquired Assets; (b) assumes, undertakes and agrees, subject to valid claims and defenses, to pay, satisfy, perform or discharge in accordance with the terms thereof all obligations and liabilities of any kind arising out of, or required to be performed under, such Acquired Assets from and after the date hereof, and (c) assumes, undertakes and agrees to pay, satisfy, perform or discharge in accordance with the terms thereof all of the obligations of the Assumed Contracts and all obligations and liabilities of any kind arising out of Buyer's assumption of the obligations under the Assumed Contracts. Seller shall remain liable for any failure of Seller to perform Seller's obligations under the Assumed Contracts accruing prior to the date hereof.

(iii)    Parties in Interest. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

(iv)     Counterparts. This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, and all of which together shall constitute one and the same instrument.

(v)      Governing Law. This Agreement and the rights and obligations of the parties hereunder shall be governed by, and construed in accordance with, the laws of the State of New York as applied to contracts made and performed entirely in such State.

21

IN WITNESS WHEREOF, the Assignor has executed this Assignment and Assumption as of the day and year first above written.

EVERGREEN PRODUCTS, LLC

By

Name: Christopher Powis

Title: Manager-Member

METRO AIR, LLC

By

Name: Christopher Powis

Title: Manager-Member

22

# EXHIBIT D

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In Re: | Case No.: | 17-31858 |
| EVERGREEN PRODUCTS, LLC, | Chapter: | 11 |
| Debtor. | Judge: | Meisel |

## NOTICE OF PROPOSED PRIVATE SALE

__Evergreen Products, LLC__ , __Debtor__ , in this case proposes to sell property of the estate to the persons and on the terms described below. If you object to the sale, you must file a written objection with the Clerk of the United States Bankruptcy Court and serve it on the party listed below not later than 7 days before the hearing date.

Address of the Clerk:
U.S. Bankruptcy Court
50 Walnut Street
Newark, NJ 07102

If an objection is filed, a hearing will be held before the Honorable __Stacey Meisel__ on __August 14, 2018__ at __11:00__ a.m. at the United States Bankruptcy Court, courtroom no. __3A__ , __50 Walnut Street, Newark, NJ 07102__ . (Hearing date must be at least 28 days from the date of this notice). If no objection to the sale is filed, the clerk will enter a Certification of No Objection and the sale will be held as proposed.

Description of property to be sold:
Office Furniture, computer equipment, kitchen appliances, warehouse supplies, equipment, fixtures and tools, vehicles and forklifts and certain inventory.

Proposed Purchaser:
EGP Enterprises, LLC

Sale price: $50,000.

☐ Pursuant to D.N.J. LBR 6004-5, I request to pay the real estate broker and/or real estate attorney at closing on the terms set forth below.

Name of Professional:

Amount to be paid:

Services rendered:

Higher and better offers will be received. They must be in writing and filed with the clerk not later than 7 days before the hearing date set forth above.

Objections must be served on, and requests for additional information directed to:

Name: Philip L. Guarino, Esq., of Guarino & Co. Law Firm, LLC

Address: 26 Park Street, Suite 2057

Telephone No.: 973/272-4147

*rev.8/1/15*

2